Our final case this morning is Nuance Communications versus ABBYY Software. May I proceed, Mr. Tyler? My name is Craig Tyler, I'm here on behalf of Nuance and Pelley. We have two issues involving personal jurisdiction and service process of reform. Corporations, I'm sure your honors are familiar with the issues. I'm going to dive right into jurisdiction since we have a lot to cover. On jurisdiction, the record is very clear that we have shown purposeful, directed activities to California companies on behalf of ABBYY Software and ABBYY Production, the sister corporation in Russia. And I think the court's decisions in Beverly Hills as well as Campbell-Pett are very helpful here because what the court said there was that the procedural context is extremely important. Just like those cases, here we have no jurisdictional discovery, we had no hearing. So what the law says is that all of Nuance's evidence and its allegations are to be taken as true unless they're specifically and directly controverted. Is your theory on ABBYY Software an agency theory? No. It's based on the activities? They're activities to the form. You do have the agency aspect of it, but I think if you look at the evidence supporting their purposeful control. And this is all the emails and the advertisements? And basically our allegation on ABBYY Software, and this is in... Of course, they're saying they're not sending any products into the U.S., it's ABBYY USA that's doing that. The only evidence that's before the court, on the record here, A191 through A196 are the ABBYY declarations. And they really have four things in them. That they don't make sales in the form, that they don't market or promote in the form, that they have a presence in the form, and then this strange one about that ABBYY Software exercises control only to the extent that the law allows you to exercise control over something you completely own 100%, which is a strange declaration. But if you look to Nuance's amended complaint, which unless it's specifically controverted, it has to be taken as true, at A16, paragraph 31, Nuance alleged that ABBYY Software and ABBYY Production exercise control over the activities of ABBYY USA, that's a California resident, including sales and marketing activities. It's exercising control. Unless that's specifically and directly controverted, which it is not, it has to be taken as true. That's inducement. That is a claim for inducement under 271B. They exercise control over a California resident in sales and marketing of the accused products. Now looking also at A16, paragraph 34, there's a specific allegation that ABBYY Software and ABBYY Production have shipped and facilitated shipment of thousands of accused products into the U.S., including into that district, the foreign district. I thought it was only ABBYY Production that was doing the shipment. I didn't know that ABBYY Software... Well, we have our allegation, which was not controverted at all, and we have direct evidence that it's ABBYY Production, but a lot of this is wrapped up in the ABBYY group, and without discovery, it's very difficult to parse it out. But how are you disadvantaged when there's no question at all about jurisdiction of the United States entity? Well, the prejudice is because you have, within the walls of the Russian sister company, ABBYY Production, you have the source code for the accused product. Now we can possibly prove infringement because we have the accused products, the software that runs, but if you're looking at patents that are algorithm-specific, you'd also like to have the source code to have the defining proof of what's in those products. But aren't there presumptions in your favor if they refuse to defend on that basis? Are the presumptions in our favor if ABBYY USA refuses to put forward the source code? They've already submitted that. I'm not sure if this is in the record, but their contention is they have no access to it, so they'll put us to our burden of proof, and we have to meet that burden by preponderance of evidence on infringement. Well, what's a license agreement? Don't they get the soft code under the license agreement? No, they actually don't. They get the software, and this was a point of contention We actually moved to compel in the lower court for the source code. So why do you need something more than the software? Well, the software can be the executable code, the ones and zeros, and you just see how it operates, but if you want to know the specific algorithms that go into that, you need the source code as well. We moved to compel the source code through ABBYY USA, and the court ruled... Wait, so they never get the code? They never get what they contend. We would suggest that the evidence would suggest otherwise, but their contention is no, they don't get the human readable source code, what they get are the executables. Of course, because they don't need the code, and the code isn't in the patent. The code is, sorry, I'm about to... The source code is not in the patent document. The patent has specific algorithms, it's not soft source code specific, so we have the prejudice. But the code itself, we have yet, although it's been requested from time to time, haven't required the code in order to prove an algorithm. And we think that we can prove it without, but we're still prejudiced because we don't have access to it, when that code, and it's good that you brought up, Judge Prost, excuse me, it's good that you brought up the licensing law, because in addition to our allegations, which have not been specifically controversial, and according to the Beverly Hills case, that's really all we need. We don't even have to go to the license agreement. If you have a purposeful shipment of the accused product into the form through an established distribution channel... But they're not shipping... You're saying that Abby Production is shipping the accused product? We've made that allegation, and they have not controverted it. So we're not... We know that Abby Production is sending the source code, but there may be other shipments being made as well. The source code isn't an infringing product. The source code is the master copy. It's how every other... It's the master. Under the license agreement, this is in A335, under section 2.3, Abby Production shall provide Abby USA a master copy of the software, which includes the accused fine reader products. That's how all these thousands of copies made their way into the U.S. That is a purposeful contact with a California resident for disseminating the accused products. In addition, one thing that's not... I don't think pointed out as well in the brief as it should have been. Also under that license agreement, at A338, section 5.13, Abby Production shall provide Abby USA with technical support and oral and written communications that may be necessary to maintain the functionality of the software. What they're saying there is Abby Production, a Russian company, is going to have continuing contacts with this California resident for the purpose of supporting the accused products. I want to be sure I understand. Your argument is that the court should exercise jurisdiction or accept the validity of the method of service process because of the necessity of information possessed only by the foreign entity? Well, I'm focusing on jurisdiction right now. And I'm focusing on the contacts. There is prejudice, but there's also these specific contacts that lead to jurisdiction. Okay, but unless there was appropriate service or whatever it is the jurisdiction requires, we can't get to that point. And I'm trying to understand why the case at the threshold must then establish that there was proper service, personal service and jurisdiction acquired by the United States court. I can turn to service if you like. Well, they're interrelated, are they not? They are. They absolutely are. Unless you have both of those factors, both of those bridges crossed, it doesn't matter, does it, whether they have the software, whether the software code is something that is available for discovery or not. It is my burden to cross both bridges, and I was crossing the first one on jurisdiction. As to service, I think the question for this court is how this court is going to apply Rule 4. Is it going to be a liberal and broad... I'm sorry, I want to take you back one sentence. Oh, sure. You're saying that if information is necessary for your case, then jurisdiction necessarily follows? No, Your Honor. Okay. I'm saying that both of these companies have purposely directed activities that relate to the accused products, and that's the basis for jurisdiction. Both of them have separate activities. Okay. With respect to Abbey Production, we talked about the license agreement. With respect to Abbey Software, the parent is in Cyprus. There is evidence we're relying on for allegations, but also in that article, the Russian article that we cite too, there is significant evidence of how that parent corporation controls what the United States subsidiary does in the U.S. So I want to go ahead and turn to the service issue because I think the question there is how is this court going to apply Rule 4? We tried to follow Rule 4 as best we could. It's difficult over Russian corporations. It's extremely difficult as to how you're going to serve those corporations, and the cases that we cite all follow the same train of thought. How do you serve a Russian corporation when the Hague doesn't apply? Now, there is discussion in the briefing about whether the Hague applies or not. Nuance submits that other courts have looked at that and have all come up with the same conclusion based on the same evidence we looked at, that the Russian Federation has refused to accept service under the Hague. They've stopped judicial... well, at least with respect to the United States. Okay, so the Hague doesn't apply. Let's say that there was no question that there was personal service. Why does there automatically follow, then, jurisdiction of the United States court? It doesn't automatically follow. I don't believe that the service... Nuance does not submit that the service affects the jurisdiction. I think there's several questions. Okay, yes, I agree with that. So, and we're trying to show that we complied with both. We met a burden of proof, and actually we met a private-basic case on jurisdiction, which is all that we're required to do in this scenario, and on service. Hague doesn't apply, then what do you do? You can look to Rule 4, and Rule 4 says if a matter is prescribed by the... Rule 4.2a, if it's prescribed by that foreign government, you can serve in that manner. And we looked to a foreign process server with experience in Russia to help us serve personally. We thought that was the best means to get them to notice. A Russian translation of the complaint. And again, if you're going to apply Rule 4 as a liberal and broad rule so that the defendant... You want to save a little bit of your rebuttal time, Mr. Tyler? Yes, Your Honor. Okay, thank you. I'll make one more point on this. Sure. The real problem with the decision, where all these cases come out, is that the court failed to consider our request for substituted service. That's where these other cases come out. How do you serve a Russian corporation? Because there's cases like... I think we've seen those in the briefs. Right. And it was... If you look at the umber hierarchy of the Third Circuit, you see that where there exists a reasonable prospect that service can yet be obtained, it's of abuse of discretion to dismiss. We should have had another opportunity. And in fact, the reasonable option here was substituted service, which we made a timely request for. Thank you, Your Honor. Thank you. Mr. Walberson. Good morning, Your Honors. Matt Walberson for the Alien Defendants Abbey Production and Abbey Software. Are they purposefully availing themselves of the California marketplace? They are not, Your Honor. How do you explain this magazine article where they say, oh, we're going to conquer that market, we are going to get in there and show, teach them a lesson? Your Honor, what... They're not in that market at all? They say, we're going to go capture that market. And... They teach them a lesson. Abbey, the Abbey entities serve the U.S. market through a license agreement with Abbey USA. Abbey USA serves the U.S. market with Abbey Products. And Abbey Production sends the core of what's necessary for Abbey USA to be in business, ships it through a license agreement over to California, right? Abbey Production provides the master copy of the software, which under the license agreement then... And then collects royalties, so everything that Abbey USA sells as a result of that, they get a portion of. What Abbey USA has under the license agreement is the right to then modify the software. So in... But these are all sister companies. They even have the same name. We're not talking about arm's length transactions here, are we? We really aren't. Same boards of directors and so forth? No, we are talking... I bet they have the same counsel. Well, we are talking about an arm's length relationship between Abbey Production and Abbey USA. They do business through that contract. There is no corporate relationship other than that they share the economy. They do business through that license agreement at arm's length. And Abbey Production gives up a significant amount of control through that license agreement, granting Abbey USA the right to modify the software and sell it to the U.S. market. And then they collect a chunk of the profit for every sale. They do collect a royalty as the licensor. And the CEO of the Russian company says, we decided to enter the market. What did he mean? He didn't mean his own company? Well, look how they entered the market, Your Honor. They didn't do it through establishing a 100% owned subsidiary, manufacturing the product over in Russia, and then maintaining control over the product and putting it into the stream of commerce. They do something quite different. They grant a non-exclusive license to Abbey USA, and Abbey USA then has the right to modify the software as it sees fit. Abbey USA markets the product in the USA. Abbey Production does not. So this case is distinguished from, for example, Beverly Hills Fan or Burger King, where the foreign defendant or the defendant maintains a control over the product and also has mutual obligations with the party in the forum. But now it says that they can't prove infringement. They have a patent valid on its face. They believe it's being infringed. And they say that they are inhibited or prevented from proving infringement in the United States, of the United States patent, because they're being deprived of jurisdiction of the foreign parents. Do you agree that that deprivation, the absence of jurisdiction in the district court of the originators does inhibit the opportunity to proceed with this litigation of infringement? Well, the answer would be to do third-party discovery. Nuance says that the prejudice here is that we need the source code and we can't get it, and we can't prosecute our patent infringement claim without it. Well, then the answer is not to just make foreign entities parties to the case. They should serve a subpoena on Abbey Production. I suppose the foreign country doesn't recognize subpoenas for discovery. I must say I don't know the laws of Russia and Cyprus, but we know that there are some countries which don't permit such discovery. Then what? Well, let's say they just decline discovery and are upheld by the Russian authorities. I would answer, Your Honor, that we're not at that point, because Nuance has not, as a plaintiff, tested that, and that question isn't presented in this case. You know, it's... Well, from what you have told us, you say that they don't really need jurisdiction over the Russian parent because they can get discovery, fact discovery, of the Russian parent. Isn't that what I heard you say? I guess my point, Your Honor, is that if it's true that they need the source code, the answer simply can't be that that confers jurisdiction, a plaintiff's need. These... Abbey Software and Abbey Production have not taken any act within the United States that's prohibited by Section 271, and that blocks jurisdiction, and so that... Importing disks? To import, Your Honor, you need presence in the United States, and neither of these entities have any presence that's well-established on this record. But they've got a license agreement with the U.S. component so that they're importing it through their... And Abbey USA is the importer. Abbey USA has the presence here. Abbey USA does import the accused software, but Abbey Production does not import it. I would also point to the Peacenet case, Your Honors, which I believe, applied to this case, establishes that Abbey Production has no presence and has taken no 271 prohibited act in the United States. Just like in that case where you had a licensor in Massachusetts granting a non-exclusive license in the forum New York, the court held that that license, that covenant not to sue, creates a relationship with the forum that is very unlike, for instance, the franchise relationship in Burger King or a distribution agreement where you have continuing mutual obligations that bring the licensor to the forum. You don't have that at Peacenet. You don't have that here. The physical transfer of a disk from Moscow  is an act of importation, is it not? It is not, Your Honor, for a number of reasons, I'll reiterate again that Abbey Production is not the importer, but I think you can also say... Only if we agree with you that these are not interrelated companies somehow, right? Well, Your Honor, there's nothing on this record to support an order saying that they're somehow interrelated. These entities... But it is not disputed that the United States company is an affiliated or subsidiary company of the foreign companies, is it? It is not disputed that Abbey Software owns 100% of the stock in Abbey USA and 100% of the stock in Abbey Production. Okay. That's what I gather. Okay. Does your argument then... Really, it's unrelated to whether or not the Hague Convention provides or whether letters rogatory are available or the other procedures. You're saying it doesn't matter whether service was achieved by personal service or through the convention. Is that right? No, our position is that service was ineffective and insufficient. You've got a Russian translation. What do you need? You need to follow Rule 4, the rule that authorizes service of process in this case. Did you get notice? Yes. Yes, we got it. Well, what do you need? You didn't even get an English. You got a Russian translation. The United States Supreme Court has held that service of process is more than mere notice. Nuance's case has established that. This is a component, procedural component of due process. But by declining to adhere or respect the Hague Convention, I don't think ever has been viewed as going so far as saying therefore no service on any Russian entity can be achieved from now on. It just eliminated the convenience of the letters rogatory, did it not? And the procedures of the Hague. That's how I'd understood that action by the Russian government. I hope this answers Your Honor's question. But the Volkswagen case, the United States Supreme Court says that if state law, the law of the forum, holds that the convention applies, it's mandatory, pursuant to the Supremacy Clause. Let's assume we reject that. How could they have served in that, in your view? Well, number one, they never even tried to serve through the Hague Convention. On this record, it is not established. Well, let's assume we reject that for a moment. Okay. So then what's their alternative? Their alternative would be let's take the State Department. Probably personal service of a Russian translation, right? No, no. That means it's expressly prohibited by Rule 4. That's the only thing they cannot do. So I'm asking you, what could they do? Well, the State Department website that Nuance relies on suggests that why don't you hire a Russian counsel and start a proceeding in the Russian courts and serve it that way. What about substituted service? Substituted service, I mean, there could be substituted service if that were to have effect outside the USA. Then it would come within Rule 4F3. But sure, do substitute service somewhere else outside the USA. I'm trying to figure out why personal service of a Russian translation is prohibited by Rule 4. I'm looking at it. I don't see that it's prohibited by Rule 4. Your Honor, if you refer to Rule 4H, I'm sorry, Rule 4H2, it expressly prohibits personal service. I'm looking at 4F. 4F2Ci, delivering a copy of the summons of the complaint to the individual personally. And, Your Honor, if you go to Rule 4H2, Rule 4F says delivering a copy of the summons of the complaint to the individual personally. But that's to an individual. We're dealing with associations here. These are corporations. So the relevant provision is Rule 4H2, which prohibits personal service while also incorporating all the other means in Rule 4F. If I could pick up on your question earlier, Chief Judge Rader, and that being, well, now, doesn't Abbey Production in fact import by sending over the master copy? Another distinguishing point in this case is that Production grants USA the right to modify the software. So this is not as if the Russian entity is just shipping goods into the United States. It's shipping something that is then used to manufacture the accused software. So there's really no, there's no act of shipping. One final point, and that is that this record establishes... By the way, how are they going to modify the software without the source code? Do they have the source code? No. No, they do not. How are they going to modify the software? They... Whoops.  They do. They have, with the rights they have under this agreement, they do in fact modify the software for sale in the U.S. You're going to weigh in the software without the source code and modify it and have a working product? Good luck. Final point, Your Honors, and that is that it's just simply not true that we're not directly controverting that these entities don't sell, import, or license in the United States. It's been our consistent position. We denied these allegations in the complaint, and we've established below, and Judge White relied on this record to hold that these entities in fact do not take any action in the United States, and therefore they're outside the reach of the U.S. patent laws. Without further questions, we'll rest on the briefs here. Thank you. Mr. Tyler, you have around 2 minutes 40 seconds remaining. Thank you, Your Honor. To address the few points made by Abby, it was raised that we haven't done anything to try to serve through the Hague, and that does raise something that's outside the appeal because we actually have. We've contacted, now that they are third parties, we've done letters of rogatory, and we were informed by the State Department that Russia will return those unexecuted. So we have tried to go that way as well. To address one other point, to import, you have to be present in the U.S. I think that's a novel theory of law, and one that's not followed in many of the cases that we, for instance, just the fellows, F-E-L-L-O-W-E-S case out of the Eastern District of Virginia a few years ago, the defendant Michelin, a Taiwanese company, not located in the U.S., the court found that they imported into the U.S. by sending the accused products into the U.S. to a resident company. Therefore, Michelin was found to infringe the asserted patent. Importation does not require that you be present in the U.S. There are other cases that we cite as well on the same point. Substitute service. Her counsel said that that's something you can do if the service is outside the U.S. One may only look at In re Potash and the other cases that we cite. Our list of records, the substituted service was on the defendant, New York attorneys. In re Potash, antitrust litigation, substituted service was on the U.S.-based agents and affiliates. RSM production, substituted service was on the defendant's New York counsel. All that substituted service took place on the U.S. entity that was best served to accept service on behalf of the foreign national. Now the judge, the district court judge, never reached the question of substitute service. He didn't talk about it at all. We requested it. He completely ignored it or didn't address it in his order. We think that that is an absolute great solution for the situation of how you serve a Russian national if they are objecting to the service of actually receiving actual notice in their possession. And all these other cases have come to the same conclusion. Nuance's contention is it was abuse of discretion for the court to refuse to allow substituted service in this situation. Thank you, Your Honor. So I have nothing further unless there's any questions. Thank you, Mr. Tyler. All rise. The Honorable Court has adjourned until tomorrow morning at 10 a.m.